FIDELITY TRUST COMPANY

*v.*

LILLIE H. BOLLES et al.

[Decided March 6th, 1912.]

Evidence *held* to show that a debt for which defendant's interest in an estate had been assigned had been paid, and that the assignments, except so far as they secured the debt while it existed, were fraudulent and void as to the assignor's subsequent creditors.

*Mr. Francis Knowles,* for Lillie H. Bolles and her children.

*Mr. John H. Backes,* for estate of E. H. Murphy.

STEVENS, V. C.

This is an interpleader. The complainant has paid into court the sum of $5,513.47. Of this sum it is said by Lillie H. Bolles and her husband, Charles, that Phoebe T. Bolles is entitled to $1,500. All the residue they *now* claim for their children. I say they *now* claim, for they originally claimed only $2,000. The balance was said to belong to John O. Bolles.

The estate of Edward H. Murphy asserts, on the other hand, that it has a first lien upon the fund to the amount of $2,000, with interest; as to $1,500 from May 29th, 1899, and as to $500 from September 11th, 1899. The indebtedness is admitted; the dispute is as to its priority.

The demand of the Bolles family is based upon a number of assignments prior in date to the assignments to Murphy. The Murphy estate contends that the Bolles assignments are fraudulent. The situation is somewhat complicated and in order to make it intelligible, I shall have to discuss it in some detail; more particularly as the claims made by the Bolleses were changed during the progress of the hearings.

In the answers of Lillie and Charles, as well as in those of their children, it was averred that $1,000 of the fund was payable to each of the children and that the balance belonged to John O. Bolles. John O. Bolles took the same position. In his answer he admits that the claims of the children "have precedence over and are entitled to be paid before the amount that shall be paid upon the claim of this defendant." On the witness-stand he swore repeatedly and explicitly that $4,000 was due to him. Nothing to the contrary was intimated by anyone, up to the close of the evidence. When, on the application of Mr. and Mrs. Bolles, the case was reopened to enable them to put in further documentary evidence, it, for the first time, appeared that, on two occasions, John O. Bolles had assigned all his interest for the benefit of the children. The significance of this change of front will be apparent as we proceed.

The first assignment, made to John O. Bolles, is the earliest in point of time. It will, therefore, be first considered. On the first hearing a demand note of $4,000 was put in evidence. It was dated June 1st, 1892, and was made by Lillie O. Bolles to the order of John O. Bolles, with interest. It was payable at the office of the Crescent Drug Company, 620 Broad street (Newark). There was also produced an assignment, dated June 20th, 1895, made by Lillie O. Bolles to John O Bolles, in full settlement and discharge of her indebtedness on the above note. It transferred

"all my present right, title and interest in and to the estate of my grandfather, John Cummings Crane * * * conditional that if there shall be remaining any surplus in said estate, more than enough to liquidate in full my said indebtedness then said surplus shall come and be delivered to me."

On these two documents John O. Bolles rested his case, and swore that the money was due him. He was cross-examined as to the consideration and he, or his counsel, produced a check for $4,500. It bore date May 14th, 1888, and was made by Phoebe Bolles, to the order of John O. Bolles. It bears the following endorsements, which I give in their order: "John O. Bolles, Lillie H. Bolles, Crescent Drug Co., Charles J. Bolles, treasurer." John first testified that the check which he had thus endorsed to Lillie constituted the consideration for the note. He afterwards admitted that it was used to buy stock of the Crescent Drug Company and that it formed no part of the consideration, but he said that he had lent Mrs. Bolles other moneys, the particulars of which he was unable to specify. Lillie testified that Phoebe Bolles had given checks to John and that John had endorsed them over to her, and that this was the consideration. She says:

"When the adjustment was made in 1892, in June, with Mr. John Bolles, that was the sum fixed upon between Miss Phoebe and Mr. John as my owing John that amount. He was willing to accept it at that amount."

John Bolles testified, further, that he did not get the note until three years after its date when he received the assignment of June 20th, 1895. Lillie Bolles testified that it was delivered immediately.

This was the substance of the evidence, on this part of the case, as first made. Shortly after its close Mrs. Bolles, for some reason, quarreled with her then counsel, Mr. Boggs, and retained her present counsel. This counsel presented a petition to reopen the hearing and, under leave of the court, put in documents which showed quite a different situation. He first produced, in addition to the $4,000 note of June 1st, 1892, a receipt therefor which stated that the note adjusted and settled in full all the indebtedness of Lillie H. Bolles to John O. Bolles, and, in addition, an assignment of even date which transferred to Charles H. Bolles, as agent of John O. Bolles, her right, title and interest in and to the estate of her grandfather, as far as necessary to satisfy the debt.

2

Appended to the bill is a copy of another assignment, made by Lillie H. Bolles, by Charles J. Bolles, attorney (under a power of attorney from her), dated May 16th, 1895, assigning the same interest as security for the same debt. It is admitted that this assignment was made. There are, therefore, three assignments, the first dated June 1st, 1892; the second, May 16th, 1895, and the third, June 20th, 1895, all apparently for the same purpose; anyone of which would have sufficed. The two earlier are in the handwriting of Charles Bolles; the last, in that of Lillie Bolles.

There were then offered two other documents—one an assignment by John O. Bolles to Charles J. Bolles, as trustee for his two daughters, dated June 6th, 1895, transferring all the interest in the Crane estate that had been assigned to him by the assignment of June 1st, 1892, and a further assignment of the same interest by John, directly to the two daughters, bearing date May 1st, 1906.

The two assignments to the children appear to have been drawn by Charles J. Bolles. Notwithstanding the singularities of these various papers, I am inclined to think that the original note, the receipt and the first assignment, all dated on June 1st, 1892, were intended to subserve an honest purpose, viz., to secure a debt which Lillie really owed John. The other papers have no other object, apparently, than to obscure the situation and to hinder and delay Mrs. Bolles' creditors. It appears that she was a large stockholder in the Crescent Drug Company, or its successor, the Crescent Drug and Chemical Company, which became insolvent in November or December, 1893.

It may be assumed from her testimony that she herself had many creditors with whom she was, as she says, engaged in making "adjustments." She, no doubt, feared that they would seize her interest in her grandfather's estate—an undivided residuary interest that would not vest in possession until the death of her mother, Elizabeth Newman—and she wanted to place this interest in the name of her children, taking care, however, to reserve to herself and her husband full dominion over it.

The husband was to hold with practically unrestrained power of disposition. I say "unrestrained" because the papers were all, with the exception of the last, to be held by Charles and not by an

independent trustee, and no notice of their existence was given to the Crane estate. They were unrecorded, and they could have been, at any time, destroyed by Charles, with his wife's concurrence, and all proof of any interest in the children, then of tender years, obliterated. As to John, he evidently had committed the care and disposition of his interest to Charles, as is apparent from a perusal of another paper—an unlimited power of attorney—in the handwriting of Charles, signed by John, made in March, 1893.

After the assignments of June 1st, 1892, and May 16th, 1895, had been made to John, he, as I have said, on June 16th, 1895, assigned his interest to Charles, as trustee, to hold in trust for Constance and Mildred, the two daughters of Charles and Lillie. The consideration is one dollar and, to quote, "other valuable and adequate consideration performed in my behalf by said Charles J. Bolles as well as by Anna C. Bolles before the ensealing and delivery of these presents." This last-mentioned assignment was one of the papers offered after the parties to this controversy had first rested. Charles was cross-examined about them and a letter accompanying the final assignment of May 1st, 1906, was produced, composed, it may be conjectured, by Charles himself, but signed by John and addressed to Charles, on which cross-examining counsel put the following questions:

"*Q.* In this letter he (John) stated 'You know the entire consideration paid me in 1895 by Anna and yourself amounted only to $2,800 when I assigned to you as trustee for your children all my rights to John C. Crane's estate which were represented by Lillie's note of $4,000 with interest additional;' what reference had that $2,800 to the $4,000, if you know?

"*A.* I know my sister paid him $2,200.

"(By the court.) It says $2,800 there.

"*A. I* paid him some money.

"*Q.* Do you know what the $2,800 was; that is the question?

"*A.* It was a consideration for the assignment executed by John in May to me as trustee for my two children.

"*Q.* Do I understand that at that time you paid him $2,800.

"*A.* I did not; no, sir.

"*Q.* Who did?

"*A.* My sister paid him $2,200 to my knowledge.

"*Q.* Well, your sister.

"*A.* Anna. I paid him some money and performed some services for him that were very profitable.

"*Q.* What was the $2,800 made up of?

"*A.* It consisted of cash paid by Anna C. Bolles and by myself.

"*Q.* It was all cash?

"*A.* I am pretty positive the money paid by my sister was all cash—possibly some of mine was in small checks.

"*Q.* On what account was that paid. Do you know?

"*A.* On what bank account?

"*Q.* No, why was it paid to your brother—the $2,200 by your sister?

"*A.* It was in connection with the Kraemer Drug Co.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"*Q.* Well, the $2,800 was paid in connection with the $4,000, as John refers to it here in this letter?

"*A.* It was paid to him as a consideration by my sister and myself, *in connection with other considerations*, to execute to me as trustee for my two children all John's right in that note and in the Crane estate—that note of $4,000——

"*Q.* You mean to say that for the $2,800 he sold to you as trustee for your children——

"*A.* No, I mean to say for more than $4,000—I mean to say that he received $2,800 in money—some of it by check—and he received also some other things by me as consideration.

"*Q.* (By the court.) These moneys paid and these services rendered, was that a satisfaction of the $4,000 note?

"*A.* I bought the note as I supposed and the collateral security following it of the Crane estate—that was my understanding at the time that I took that over as the rights of my children—the majority of the *consideration being* paid by my sister Anna.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"*Q.* (By the court.) Now were these payments that you speak of and these services that you speak of considered to be in satisfaction of that amount ($4,000)—in liquidation of that amount if you like. I want to know what the situation was. Cannot you answer that?

"*A.* Liquidating Mrs. Bolles' debt to John Bolles.

"*Q.* She owed the $4,000?

"*A.* Yes.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"*Q.* I asked whether the $2,800 was paid to John O. Bolles because John O. Bolles was your wife's creditor to the amount of $4,000?

"*A.* Yes, sir."

From this examination it is perfectly apparent that on June 6th, 1895, John Bolles's claim of $4,000 was completely satisfied. And yet we find that on June 20th, 1895—that is, two weeks afterwards—Lillie Bolles, by an instrument under seal, in her own handwriting, made another assignment of her interest in the Crane estate (the one first put in evidence), reciting that she was indebted to John in the sum of $4,000, "as is evidenced by my

promise to pay upon demand to said John O. Bolles as of the date June 1st, 1892," John, Lillie and Charles were all asked why this assignment was made, and they said they could not tell. On May 2d, 1906, John again assigned his interest, this time directly to Constance and Mildred. When the claims of the Bolleses were attacked as fraudulent, John, in his answer, set up the assignment to him as his own and as entitling *him* to precedence, concealing altogether the fact that he had surrendered all interest in it to his two nieces. When the case was reopened Charles Bolles attempted to hold Mr. Boggs, his former counsel, responsible for this. But Mr. Boggs says, positively, that his attention was not called to these papers, and it is quite inconceivable that a lawyer of his experience would, in the pleading, allege title in John when the documents before him showed title exclusively in Mildred and Constance. The only explanation for the change of front that suggests itself is that the Bolleses were not satisfied with the case as made, and thought it would be desirable to bolster it up by a further production of papers.

But this is not all. Murphy had given notice of his assignments to the trustees of the Crane estate at the time when he advanced money on the faith of them in 1899. John O. Bolles did not give any notice until after the death of the life tenant, Mrs. Newman, who died on May 10th, 1909. The notices then served, in June and July, 1909, were the assignment to John O. Bolles of May 16th, 1895, made just before he was paid in full, and the assignment to him of June 20th, 1895, made just after. The notice was not to pay the children (the two assignments to them not being mentioned), but to pay John O. Bolles. The significant fact in connection with all this matter is that whenever it was necessary to make a public disclosure, it was the assignment of June 20th, 1895, that was put forward and not the assignments to them.

There is another fact which I must here mention: Murphy was, during the year 1899, acting as Mrs. Bolles's counsel. She was in need of money and applied to him for a loan. He agreed to lend, on the security of her interest in the Crane estate, first, $1,500, and shortly afterwards, $500. She made two affidavits, one accompanying each loan, in which she swore that she had

made no prior assignment. Mr. and Mrs. Bolles now say that Murphy was informed of the prior assignments, and Mrs. Bolles says that she had no recollection of making the affidavits. She admits that she signed the papers, but says that she did not know their contents. They were taken, one before Wm. G. Romaine, and the other before Thos. L. McConchie. Mrs. Bolles is a very intelligent and alert witness. It appears to me to be simply incredible that she swore, or would have been permitted to swear, to the contents of such papers without knowing what she was swearing to; or that her own counsel, after having been told of the prior assignments, would have advised or permitted her to swear to a falsehood, and would then himself have lent money on the faith of it. Concealment here quite accords with concealment elsewhere.

There is still another assignment to which I have not as yet alluded. It is dated November 20th, 1893, and purports to be a transfer by Mrs. Bolles to her husband, in consideration of $3,500, of her interest in the Crane estate, in trust, to have and to hold, without giving bond or indemnity, until her children, Constance and Mildred, should each attain the age of twenty-five years, when she empowers her trustee to pay to Phoebe T. Bolles the sum of $1,500 and to Mildred and Constance the sum of $1,000 each, and in the event of the death of one or more of the three beneficiaries, to pay the share of such beneficiary to her (Lillie's) legal heirs.

This document was, like most of the others, signed when Mrs. Bolles was "adjusting" her liabilities with her creditors. Her testimony is that she owed her husband's sister, Phoebe, $3,500, an amount ascertained at the same time that she ascertained the amount of her indebtedness to John. She did not give her sister-in-law a note at that time, such as she gave John, or any paper definitely stating the amount due. She says she handed Crescent stock as collateral. She produces no receipt for the stock and no voucher of any sort that would evidence the indebtedness, and her statement as to how it arose is vague in the extreme. She says the loans were not made to her by Phoebe herself, but through John; that Phoebe preferred not to deal directly with her. Phoebe is not called to corroborate her, al-

though alive and accessible. She further says that she took the money received through John and bought stock of the Crescent Drug Company and became the "virtual" owner of it. She was then asked how, if she owed Phoebe $3,500, she came to make a trust deed that only gave Phoebe $1,500 and her daughters $2,000, and her answer was that it was a suggestion of her father-in-law.

Her testimony is as follows:

"At that time I had practically refused to do anything more in regard to giving any security for any debt that I owed and Miss Phoebe—the Crescent Drug Company was going into the hands of a receiver—and she was very anxious to have some security besides the stock that she held, and there was a meeting of the Crescent Drug Company on that day and some spirited words and that was all I would do. After considerable discussion it was my father-in-law who suggested—Miss Phoebe had intended to leave my two girls some money and it was his suggestion that it was done this way and naturally I acquiesced. I was very glad to have the girls remembered to that extent."

It does not appear whether the assignment, as made, was acceptable to or ever seen by Phoebe, or that Phoebe ever did any act by which she released or donated a part of her claim. If it was an attempt to secure Phoebe to the extent of $1,500 only, it was not a happy one. It begins by stating that Mrs. Bolles was of full age and *solvent,* a statement not usual in such a paper and not entirely consistent with her evidence. Then it assigns the interest in the Crane estate to Charles, as Phoebe's trustee. It does not appear that he was so constituted in any other way than by the paper. It is expressly provided that the trustee is not to give bond or indemnity and that he is to hold this interest, not, as we would have supposed, during the life of the beneficiary for life, Mrs. Bolles's aged mother, but until the youngest of the daughters should attain the age of twenty-five years. He is to disburse the income or receipts to his three beneficiaries "within the sole discretion and judgment of said trustee," and what is still more singular, he is to pay not Phoebe's heirs, in case of her death, but Lillie's heirs. John Bolles is seventy-eight years old, Charles is considerably younger, Phoebe's age is not given, but she could not have been

very young when this paper was executed. It was doubtful, under such a trust, whether she would ever receive any part of this money and it was certain that if she died before Constance had reached the age of twenty-five, her heirs would not. It is not pretended that any written acknowledgment of a debt of $1,500 was ever delivered to Phoebe or that during the last nineteen years one cent of interest has ever been paid to her. Taking this paper in connection with the papers given contemporaneously and subsequently to John to secure him; considering the utter lack of vouchers to support Lillie's story; the failure of Phoebe or her self-constituted trustee to notify the Crane estate of the interest transferred and the failure of Phoebe herself to appear and testify, it cannot be doubted that the transfer was an effort to shield Mrs. Bolles's interest in her grandfather's estate from the claims of her creditors. .

My conclusion, therefore, is that the debt to John O. Bolles was paid and that the assignments, except in so far as they secured that debt while it existed, were, under the adjudged cases, fraudulent and void as to the subsequent creditors of Mrs. Bolles. *Washington National Bank* v. *Beatty, 77 N. J. Eq. (7 Buch.) 252; McNulty* v. *McCarthy, 78 N. J. Eq. (8 Buch.) 366.* The assignment, alleged to have been made on Phoebe's behalf, is included in this category.

Had I come to the conclusion that the assignment was valid, another question would have arisen, suggested by Vice-Chancellor Emery's very recent decision in *Jenkinson, Executor,* v. *New York Finance Co., 79 N. J. Eq. (9 Buch.) 247.* He there holds that a subsequent assignment of a legacy, made for value, without notice of a prior assignment, and after inquiry of the trustee, followed by notice to the trustee, has priority over the claim of a prior assignee who has given no notice. This question had been referred to but was left undecided by the court of errors and appeals in *Cogan* v. *Conover Manufacturing Co., 69 N. J. Eq. (3 Robb.) 814.* The case in hand differs from the case decided by Vice-Chancellor Emery in the circumstance that there is no proof, Murphy being dead, that he first made inquiry of the trustee. Had he made it, he would have learned nothing. It does

appear that he took the extraordinary precaution of obtaining an affidavit from the assignor. The priority of the second assignee, in this class of cases, is rested upon two principal grounds, first, the negligence of the prior assignee in failing to give notice; second, the more complete title of the assignee who gives the notice. Not being able to take physical possession of the *res* he does that which, as far as the nature of the case will admit, is the equivalent of such taking. By giving the notice he makes the trustee or holder of the fund his own trustee. On this theory, it was held by the house of lords, in a case in which the subsequent assignee had given notice but had not made inquiry, that he had acquired priority over a prior assignee who had given no notice. *Foster* v. *Cockerell, 3 Cl. & F. 457.* To so hold would be in harmony with the registry acts and with the various acts, like the mechanics and municipal lien acts that give priority in the order of notice. I do not, however, think it necessary to decide the question, inasmuch as I have come to the conclusion that the Murphy assignments are prior, on the ground stated.

I ought to add that Mr. Bolles put in evidence two letters said to have been sent by Mr. Murphy in which assignments are referred to. The signatures are admitted, but the theory of counsel for the Murphy estate is that Charles Bolles, being a chemist, was able to efface the original matter and substitute, in typewriting, that which we now find. He proves that they were not written by the typewriting machines ordinarily used by Mr. Murphy, and he points to their physical condition as indicating that papers placed in a drawer, or box, in the Point Pleasant house could hardly have been burned in the fire which destroyed it, in the way indicated by their present appearance. He seeks, further, to discredit the letters by the evidence of Mr. McConchie and Mr. Allen. The evidence tends to cast suspicion upon them. Whether it does more may be open to question. It is at least strange that Mr. Murphy should, after having asked for and obtained the papers, which he must have known would impair if not destroy his security, lend his money upon them and require Mrs. Bolles to swear, in effect, that they were non-existent.

I think the case can, without deciding these troublesome questions of law and fact, be satisfactorily disposed of according to the doctrine of the case of *Washington Bank* v. *Beatty,* to which I have already referred.